JOSIAH A. ROBERTS, plaintiff in error, vs. HOCKLEY C. McKEE, defendant in error.

One member of a firm, after the dissolution of the partnership, will be restrained from publishing letters written to him by another member in the course of their business, and appertaining thereto, without the consent of the writer; it not appearing that the purpose of justice, civil or criminal, required the publication.

In Equity, in Muscogee Superior Court. Decision on demurrer by Judge WORRILL, May Term, 1859.

This was a bill, filed by Josiah A. Roberts, against Hockley C. McKee, to enjoin and restrain the exhibition and publication of certain letters written by complainant to defendant.

The bill states that in the years 1857 and 1858, complainant was a partner with defendant and his son, John McKee, in the business of buying and selling carriages, &c., in the city of Columbus, under the firm of McKee, Roberts & McKee. That said partnership was dissolved in September, 1858, and defendant retained all the books, papers, and correspondence belonging to said firm. That they did a large credit business, and complainant being the active member of the firm,

Roberts vs. McKee.

it became his duty to enquire into the standing and credit of persons trading with them. That defendant, who was the senior partner, was often absent, and complainant was in the habit of writing letters to him, informing him of the pecuniary standing and responsibility of persons doing business with their house, or desiring to do so. That he thus frequently wrote to defendant confidential letters, in relation to the character of many persons, with no other view, and for no other purpose than to subserve the interest of the house, and to keep the partners advised of the condition of the business, and the standing and credit of its customers.

The bill further states, that since the dissolution of said firm, defendant, in violation of the confidence reposed in him, and for the purpose of *involving him in serious and personal* difficulties, has exhibited the letters aforesaid, or a portion of them, to persons in the city of Columbus, and is threatening to give publicity to said letters, for the purpose of injuring complainant, and with no view to benefit the business of said firm.

The bill further states, that complainant has good reason to fear that the publishing of said letters will involve him in litigation or serious personal difficulties, to his great damage and injury, if defendant is not enjoined from making known or publishing the contents thereof.

The bill prays, that defendant be enjoined and restrained by the order of the Court, from exhibiting or publishing said letters, or making known the contents thereof.

The bill received the sanction of the Chancellor, and an injunction issued agreeably to the prayer thereof.

Afterwards, and during the May Term, 1859, of the Superior Court of Muscogee County, defendant, by his solicitor, moved to dismiss said bill for want of equity.

The Court, after argument, granted the motion and dismissed the bill, and complainant excepted.

W. DOUGHERTY; and MOSES & LAWES, for plaintiff in error.

HOLT & HUTCHINS, *contra.*

*By the Court.*—LUMPKIN J. delivering the opinion.

The question in this case is one of novelty in our Courts; and I approach it with a full sense both of its delicacy and importance.

To give publicity, wantonly, to confidential correspondence, meets with the prompt rebuke and merited condemnation of every one not lost to all honorable feeling. It is a death-blow to the best interests of civilized society itself, as well as to all the endearments of family and social intercourse. While all this is fully admitted, the issue to be met and decided is, are Courts of Equity clothed with power to interpose and grant relief in such cases?

Judge Story, upon a review of the authorities, has come to the conclusion that the restraining process of a Court of Equity may be invoked to prevent the publication of mere private letters on business, or on family concerns, or on matters of personal friendship, as well as those which fall within the line of literary compositions. *2 Story's Eq. Jur. sec's* 943, 944, 945, 946, 947, 948, 949.

And conceding that Courts of Equity act alone upon the principle of protecting the rights of property, and not upon the grounds that such publications tend to wound the feelings, to degrade or injure the author, and to expose him to personal abuse and litigation, or to disturb the peace of society, still we think the jurisdiction can be sustained, on one broad and comprehensible ground at least; and one which, when announced, will tend greatly to promote confidence—the only solid foundation upon which society rests—by taking away the temptation to its betrayal. It is the principle announced by Lord Eldon, in *Gee vs. Pritchard,* (*2 Swanston Ch. Rep.* 403,) and that is, by sending a letter, the writer has given, for the purpose of reading it, and in some cases of keeping it, a property to the person to whom the letter is

addressed, yet that the gift is so restrained, that beyond the purposes for which the letter is sent, the property is in the sender.

Is then the publication of the letters written by one of these partners, to his copartner, necessary to the winding up of the business of the concern, or even to the proper vindication of the rights of the defendant; or, in the language of some of the cases, do the purposes of justice, civil or criminal, require their publication? If so, it may be that their publication was impliedly involved to that extent at the time they were written. They were intended to influence the conduct of McKee. If they had that effect, and he has thereby exposed himself to injurious imputations, self-vindication, it would seem, would entitle him to use these letters, even without the consent of the writer. A mere suggestion or representation by McKee that their publication was necessary for that purpose, would not be sufficient. The affidavit filed by William Pritchard, in the case in *Swanston*, to dissolve the injunction, presented a very plausible case. It alleged that the plaintiff, by withdrawing her regard and esteem from him, and treating him in the injurious manner therein represented, reports and suspicions prevailed in his neighborhood that he had been guilty of some gross acts of misconduct; and that he was greatly lowered in the estimation of many of his parishioners, (being rector of Walton on the Hill,) and that hence he felt it necessary to publish the correspondence between Mrs. Gee and himself, to be circulated privately, and not with a view of profit to himself or to gratify any vindictive object or motive of resentment toward Mrs. Gee. But all this, and much more, would not suffice, in the opinion of the Chancellor, to break the seal of confidence under which the letters, threatened to be published, were written.

If such be the rule, with what pretence can it be urged that any one has the right to spread private letters before the world, merely to gratify personal enmity or revenge, and

thereby subject the writer to injury and abuse; or to administer to a depraved public appetite? And delicate as the duty is, we believe the Courts ought not to hesitate to interpose and protect the writer, as well as the peace and good order of the community, against such attempts. Let the letters themselves be produced and exhibited to the Chancellor, to be examined by him upon the hearing of the motion to dissolve the injunction, and otherwise he will be unable to decide intelligently in the premises. He should see to it in the meant me, that the correspondence is not brought surreptitiously before the public, under the pretext of making it a part of the pleadings.

It is insisted by our young brother Hutchins, that the text in Story is not supported by the cases which he cites, and he has submitted an able and ingenious criticism upon the authorities, to establish his position. But what was the point decided in the leading English case upon this subject? viz.: *Gee vs. Pritchard, 2 Swanston's Ch. Reports,* 403, a case thoroughly argued by such counsel as Wetherell and Sir Samuel Romilly, and in which all the previous adjudications were carefully sifted and scrutinized? It was this: that a Court of Equity has jurisdiction to restrain the publication of private letters, on the ground of a qualified right of property in the writer; and that there is no distinction between private letters of one nature and private letters of another nature. And we look upon that case as sustaining, to the fullest extent, the propositions laid down by Judge Story, and the triumphant vindication of the great principles of public policy and sound morality, upon which the doctrine is founded. And if the Courts have resorted to a mere device for this purpose, namely, the idea of property, in whole or part, in the writer, they are justified by a similar practice in other cases. In an action, for instance, for the seduction of a daughter, the plaintiff comes into Court as a master, suing for the loss of service of his servant; but goes before the jury

as a father, to claim damages of the defendant for the dishonor and ruin brought upon his daughter and family.

I would add, in conclusion, that but few subjects would be more attractive than the correspondence of some large banking and business house, of any description. Suppose it were announced that there was "in the press, and speedily to be published, the business correspondence of the Rothschilds," would not expectation be on tiptoe? We do not suppose that the business letters of Messrs. "McKee, Roberts & McKee" would be quite so eagerly looked for, yet, I dare say, it would find as many readers as many of the professed literary works of the present day. These letters may be valuable as *property*.

Judgment reversed.

Judge STEPHENS absent.